Edward WALTON, Respondent,

v.

**UNITED STATES STEEL CORPORATION**
**and Ross Redd, Appellants.**

No. 49028.

Supreme Court of Missouri,

Division No. 1.

Nov. 14, 1962.

Alexander & Robertson, L. A. Robertson and Ernest E. Baker, St. Louis, for appellants.

James E. Hullverson, Hullverson, Richardson & Hullverson, St. Louis, for respondent.

HOLMAN, Commissioner.

Plaintiff sustained severe personal injuries when struck by a "lift" of angle irons which was dropped from an overhead crane being operated by defendant Ross Redd in the warehouse of the corporate defendant. In this action to recover damages for his injuries plaintiff obtained a verdict against both defendants in the sum of $136,000. A required remittitur was entered by plaintiff in the sum of $46,000 and defendants have appealed from the $90,000 judgment which ensued.

A motion filed by plaintiff to dismiss the appeals because of alleged violations of Civil Rule 83.05, V.A.M.R., was ordered taken with the case. Appellants have filed a motion for leave to file a supplemental brief amending their original brief which motion was also ordered taken with the case. While there is some merit in plaintiff's motion we have decided that it should be overruled and that the motion of appellants should be sustained and their supplemental brief ordered filed herein.

United States Steel Supply, a division of United States Steel Corporation (hereinafter, for convenience, referred to in the singular as "defendant") maintained a warehouse on Sarah Avenue in St. Louis, Missouri, for the processing (cutting to the required length and shapes to suit the needs of customers) and sale of steel and aluminum products. About 10 percent of the products sold were called for by customers but the remaining 90 percent was delivered to the customer's place of business. Defendant did not own any trucks or employ any drivers to provide a delivery service. At the time in question all deliveries from this warehouse were made by Highway and City Delivery Service, Inc. (hereinafter referred to as "Highway") who had entered into a written contract with defendant on October 13, 1958, to provide that service. Highway furnished three trucks (which were built according to specifications furnished by defendant) and drivers therefor to deliver products from the defendant's warehouse.

Plaintiff, a truck driver, was employed by Highway and had been assigned to drive a truck making deliveries for defendant. He was injured on June 3, 1960, while his truck was being loaded. A "lift" of angle irons was being moved by overhead crane to the vicinity of the truck to be loaded thereon. The angle irons were held by a chain around each end thereof suspended from a "rack" which was a part of the crane. The movement of the load was stopped as it neared the truck in order to change the direction. When the operator again started to move the load one rack moved and the other stuck, with the result that one end of the load was pulled away from the chain which held it and the angle irons fell to the floor. Plaintiff had observed the occurrence and sought to escape injury by "diving" under the truck but the angle irons struck him in the pelvic area. No point is made on this appeal concerning a submissible case of negligence and hence no further details need be given regarding the casualty.

The first point made in the brief is that "the trial court erred in denying the motion of defendant United States Steel Corporation for a directed verdict at the close of all the evidence, because the evidence shows that plaintiff was a statutory employee of said defendant, or that he was a loaned employee of said defendant and his exclusive remedy against said defendant was before the Missouri Industrial Commission, and the circuit court was without jurisdiction in this case." In this connection we note that defendant in its amended answer pleaded that "it was operating under the provisions of the Missouri Workmen's Compensation law at the time of the occurrence alleged in plaintiff's petition, and that at said

time there was in full force and effect a contract between defendant and the Highway and City Delivery Service, Inc., whereby said company was to furnish to defendant at its Supply Division, located at 310 South Sarah Street in the City of St. Louis, Missouri, certain trucks and drivers thereof for the purpose of delivering defendant's products to its customers in the operation of its usual business and that by reason of said contract plaintiff was on the premises of the defendant's Supply Division on June 3, 1960, when he allegedly sustained the injuries set out in his petition, and plaintiff was therefore a statutory employee of the defendant United States Steel Corporation and is limited to the compensation provided for by the Missouri Workmen's Compensation Law and plaintiff is not entitled to maintain a common law action against the defendant United States Steel Corporation." That defense was submitted in defendants' Instruction No. 4 which reads as follows:

"The court instructs the jury that any employer who has work done under contract on or about his premises, which is an operation of the usual business which he there carries on, shall be deemed an employer and shall be liable under the Missouri Workmen's Compensation law to the employees of such contractor when injured on or about the premises while doing work which is in the usual course of the employer's business.

"The court further instructs you that if you find and believe from the evidence that the defendant United States Steel Corporation contracted with plaintiff's employer to do work on or about its premises which was an operation of the usual business carried on there by defendant United States Steel Corporation, and that plaintiff's employer was an independent contractor in doing said work, and that plaintiff was injured by reason of an accident arising out of and in the course of his employment on the premises of defendant United States Steel Corporation while plaintiff was doing said

work, if you so find, which was an operation of and in the usual course of the business of the United States Steel Corporation carried on on its premises, if you so find, then the court instructs you that plaintiff cannot recover against defendant United States Steel Corporation, and you should find in favor of defendant United States Steel Corporation and against plaintiff." .

The court also gave Instruction No. 5 at the request of plaintiff which, in a general way, may be described as a converse of No. 4. That instruction required a finding, as a predicate to a finding for plaintiff upon the issue submitted, that the work of Highway "was not an operation of the usual business which the United States Steel Corporation there carried on, but was only incidental, ancillary or auxiliary thereto."

From what we have heretofore said it appears clear that plaintiff was not an actual or direct employee of defendant. Defendant's claim is that he was a so-called statutory employee under the provisions of § 287.040(1) (unless otherwise indicated all statutory references are to RSMo 1959, V.A.M.S.) which reads as follows: "Any person who has work done under contract on or about his premises which is an operation of the usual business which he there carries on shall be deemed an employer and shall be liable under this chapter to such contractor, his subcontractors, and their employees, when injured or killed on or about the premises of the employer while doing work which is in the usual course of his business." If plaintiff was an employee of defendant, statutory or direct, his exclusive remedy was under the Workmen's Compensation Act. That act, if applicable, would supersede any right plaintiff might otherwise have had to maintain an action at common law. See § 287.120.

■ Defendant has also suggested that plaintiff was its "loaned employee." That theory was not pleaded or submitted in the trial court. Since it is raised for the first

time in this court it will be disregarded and we will limit our consideration to the question as to whether plaintiff was a statutory employee.

█ The defense that plaintiff was a statutory employee and hence could not maintain an action at common law is an affirmative one and the burden of pleading and proving that defense rests upon the defendant. Kemper v. Gluck, 327 Mo. 733, 39 S.W.2d 330. And in determining whether the court erred in failing to direct a verdict for defendant we should bear in mind the settled rule that a "court should never withdraw a question from the jury, unless 'all reasonable men, in the honest exercise of a fair, impartial judgment, would draw the same conclusion from the facts which condition the issue.' * * * Where there is uncertainty arising 'from a conflict in the testimony or because, the facts being undisputed, fair-minded men will honestly draw different conclusions from them, the question is not one of law but of fact to be settled by the jury.' " Courtney v. Ocean Accident & Guaranty Corp., 346 Mo. 703, 142 S.W.2d 858, 860. Also, in ruling the question we will view the evidence in the light most favorable to plaintiff and will disregard defendant's evidence unless it aids plaintiff.

It was stipulated that Highway was a major employer under the Workmen's Compensation Act and carried a policy of workmen's compensation insurance with American Surety Company, and that said insurer had paid plaintiff the compensation benefits he was entitled to; that defendant was also a major employer under the Act and had qualified as a self-insurer.

Plaintiff testified that he was employed by Highway on October 13, 1958, and continued to work for it until the date of his injury; that his main duty was as a truck driver making deliveries for defendant, although he had on occasions done some work for Highway on trucks transporting goods for other customers; that he took no orders or directions from anyone except Mr. Link

of Highway; that he filled out a "Daily Defect Sheet" and a card reporting his daily time and mileage which were prepared for and delivered to Mr. Link; that he had not received pay for some holidays for which defendant's employees were paid; that he did nothing for Highway in connection with defendant's operations except transporting steel; that he was not required to assist in loading or unloading the products hauled to and from defendant's warehouse; that in the loading of his truck he would tell the loaders and crane operator where to place the load on his truck so that the load would be properly balanced and placed in conformity with the "layout" of his route; that he had no duty to unhook the crane chains in the loading process but he occasionally did so voluntarily and as an accommodation; that occasionally one of defendant's employees would request that he pick up steel at some other warehouse and bring it to defendant's warehouse and he had always complied with that request; that he had occasionally called someone at defendant's warehouse for directions in regard to working overtime; that Highway had furnished him a number of uniforms with the words "United States Steel," or the initials "U.S.S." thereon, which he wore when hauling defendant's products.

Plaintiff further testified that he had never done any hauling from one part of the defendant's warehouse to another location therein, nor had he hauled any products from one of defendant's plants to another of its plants; that he had never seen any employees of the defendant drive any trucks; that on the day of his injury he had pulled his truck into Bay 2 of defendant's warehouse and it was being loaded by a crane operated by defendant Redd; that on that occasion he had not unhooked any of the chains on loads that had been placed on his truck; that he was standing on the running board of his truck checking his bills of lading so as to lay out his route when he saw the load of the crane approaching and tried to get under the truck for protection but was struck by the falling steel.

The trucks furnished by Highway for delivering defendant's products had a sign thereon displaying the name of defendant. There was also a smaller sign on the trucks showing they were owned and operated by Highway. Under the provisions of the written contract Highway paid for all gasoline used by the trucks and also carried and paid for workmen's compensation and liability insurance on its trucks and drivers. The trucks were to be operated 40 hours per week in the exclusive service of the defendant and garaged on its premises. Highway was required to maintain the trucks and pay all licenses and taxes thereon. Defendant paid Highway a rental fee for each truck and a charge for each mile driven, plus the amount Highway paid out for wages of its drivers and the cost of their uniforms. The contract refers to Highway as "Carrier" and to defendant as "Shipper." It also contains the following: "Carrier shall be free from all direction and control of Shipper and shall: (a) choose and follow its routes of movement; (b) employ, discharge, and pay its drivers and all other employees; (c) select, maintain, and operate its motor trucks, trailers and equipment, provided, however, that such motor trucks, tractors, semi-trailers and equipment shall be of such construction and design as shall be suitable in Shipper's judgment for the performance of the work; and (d) maintain such motor trucks, tractors, semi-trailers and equipment in good order, repair and safe operating condition at its own expense. Carrier shall be an independent contractor, and nothing herein shall be construed to be inconsistent with such status."

■ In discussing the statute here involved this court, in the case of Perrin v. American Theatrical Co., 352 Mo. 484, 178 S.W.2d 332, 334, stated that " 'the chief purpose of provisions of this type is to protect the employees of subcontractors who are not financially responsible, and to prevent employers from relieving themselves of liability by doing through independent contractors what they would otherwise do through direct employees.' " The decision further declares that " 'if the work being done at the time of injury is not an operation of, or in the usual course of, the business which the employer customarily carries on upon his premises, but is only incidental, ancillary, or auxiliary thereto, then the contractor, subcontractor, or his employee who is injured while engaged in such character of work is not a "statutory employee" within the meaning of the act * * *.' " We have also said that in determining whether a person is a statutory employee "it is very difficult, and perhaps undesirable, to formulate a generally applicable rule (annotation 150 A.L.R. 1214, 1216) and there is no infallible test. Each case presents its own peculiar difficulties and must be determined upon its particular facts." Viselli v. Missouri Theatre Bldg. Corp., 361 Mo. 280, 234 S.W.2d 563, 566.

■ We have decided from a consideration of the facts heretofore stated that all reasonable minds would not conclude that plaintiff's work was an operation of the usual business which defendant customarily carried on upon its premises. In that situation the issue presented a question of fact which it was appropriate for the jury to decide and hence the court properly overruled defendant's motion for a directed verdict.

We deem it unnecessary to engage in an extended discussion of this question. Some of the facts which we consider significant are (1) defendant had no employees or trucks with which it could have made deliveries at its St. Louis plant; (2) there is no evidence to indicate that it had ever made deliveries from that plant with its own employees and equipment; (3) plaintiff had made no deliveries from one point to another in the warehouse nor from one of defendant's plants to another of its plants; (4) the only work plaintiff was required to do on defendant's premises was to drive the truck to and from the point of loading or unloading and to supervise the loading process, and (5) almost all of the work done by plaintiff was away from the premises of defendant.

In support of their respective contentions plaintiff and defendant have each cited a large number of cases, many of them having been decided by the courts of other states. We have read all of these cases and find that while they have some bearing on the question, practically all of them are readily distinguishable upon the facts or the particular statute involved. The principal cases relied on by defendant are Ward v. Curry, Mo.Sup., 341 S.W.2d 830, and Montgomery v. Mine LaMotte Corp., Mo.Sup., 304 S.W.2d 885. The situation in the Ward case was similar to the one in the case at bar in the respect that it involved an employee of an independent contractor engaged in delivering sand to the customers of the Stewart Sand & Material Company. Although the court indicated its view that the plaintiff was a statutory employee of Stewart, the case is distinguishable in so many respects that we do not find it applicable. In that case plaintiff had sought and obtained workmen's compensation benefits from Stewart and, in this court, conceded that he was a statutory employee of Stewart. (The case involved the construction of a clause in Stewart's liability insurance policy which excluded coverage of plaintiff's damage claim against another of Stewart's employees if plaintiff was an employee of Stewart.) Also, in Stewart, the sand company had some trucks of its own which were engaged in the same delivery work as was plaintiff. Finally, Stewart was a jury-waived case in which the trial court (and this court on appeal) was required to find the facts and the question of the submissibility of a fact issue to a jury was not presented. In the Montgomery case the plaintiff was employed by an independent contractor engaged in hauling ore from defendant's mine to its processing plant. Defendant's trucks frequently engaged in the same work. In that situation the court properly held that plaintiff's work was an operation in the usual course of defendant's business and hence plaintiff was a statutory employee of defendant.

Plaintiff places his main reliance on the case of Sheffield Steel Corp. v. Vance, 8th Cir., 236 F.2d 928, which we think supports his contention. That case involved a decision as to whether the plaintiff was a statutory employee under § 287.040(1), the factual situation being very similar to the instant one. In affirming the plaintiff's common law judgment the court stated that "unless no room for reasonable difference in judgment exists, the question is primarily one for appraisal and resolution by the trier of the facts upon all the elements of the situation presented. Here, as we have indicated, it seems to us that what the truck driver was doing was sufficiently a matter of separate function and responsibility in carrier business, so that the trial court properly could regard it as involving more than the loading task which the steel company's employees were to perform, and as having an identity and significance, in the purpose which the carrier was to serve, which entitled it to be viewed as a carrier operation and not one of the usual business of the steel company." 236 F.2d 931, 932.

Other cases cited by each side, as heretofore indicated, need not be individually discussed because they involve either different facts or a statute unlike the one we are here considering. As stated, we rule that the trial court did not err in overruling defendant's motion for a directed verdict.

Defendant's next contention is that Instruction No. 5 given at the request of plaintiff was erroneous in a number of respects. It reads as follows:

"The court instructs the jury that even though it was essential and necessary to the operation of the business of the United States Steel Corporation in connection with its business at the plant mentioned in evidence that its products be transported by someone to and from such premises, yet you are instructed that if you find from the evidence that the United States Steel Corpora-

tion at said plant and premises did not directly employ trucks and drivers of its own to make deliveries of its products, but arranged for shipments of such products to and from such plant either by will-call pickup or by common carrier or by independent contractors, and that the work which the Highway and City Delivery Company did under contract with the United States Steel Corporation on or about the premises of the Steel Corporation was not an operation of the usual business which the United States Steel Corporation there carried on, but was only incidental, ancillary or auxiliary thereto, and that Mr. Walton was injured in performing work done under such contract, then and in that case the Workmen's Compensation law and Mr. Walton's receipt of medical and other benefits thereunder from the Highway and City Delivery Company or its insurer does not bar his right, if any, to recover against the United States Steel Corporation, and your finding on that issue in such case would be in favor of Mr. Walton."

■ This instruction is substantially a converse of defendant's Instruction No. 4 heretofore set out. The first contention is that the instruction permitted the jury to find inconsistent and conflicting facts in that it recited that it was essential to the business of defendant that its products be transported by someone to and from the plant in question but also permitted a finding that such transportation was only incidental to the operation of the usual business of the defendant. We think this contention is without merit. The mere fact that delivery of defendant's products by someone was essential to its operation does not mean that such delivery service must be considered an operation in defendant's usual course of business. Many services are essential to the operation of a business that are not operations of the usual business of the concern within the meaning of § 287.040. See Wooten v. Youthcraft Mfg. Co., Mo. Sup., 312 S.W.2d 1 [1]. Since we see no inconsistency in the findings complained of this contention is disallowed.

■ The next complaint relates to the following portion of the instruction: "that the United States Steel Corporation at said plant and premises did not directly employ trucks and drivers of its own to make deliveries of its products, but arranged for shipments of such products to and from such plant either by will-call or pickup or by common carrier or by independent contractors * * *." Defendant says that part of the instruction was confusing because it injected a foreign issue into the case and prevented the jury from considering the facts bearing on the issue as to whether plaintiff was engaged in an operation of the usual business of defendant. We are unable to understand how the inclusion of these admitted facts would have confused the jury or distracted its attention from the essential issue submitted. The jury was additionally required to find the principal fact issue, i. e., "that the work which the Highway and City Delivery Company did under contract with the United States Steel Corporation on or about the premises of the Steel Corporation was not an operation of the usual business which the United States Steel Corporation there carried on." This contention is ruled adversely to defendant.

The third and final contention of error in regard to the instruction is very similar to the second contention which we have just ruled upon. It is stated in defendant's brief as follows: "The instruction hypothesizes conceded facts in such a way as to amount to an argument that the jury should and could find the essential facts necessary to a verdict for plaintiff on the basis of those conceded facts when they were not sufficient to support such a finding and the instruction was so drawn that the jury would not feel it was necessary to consider any other facts on the issue." We do not think the portion of the instruction here complained of is argumentative. As we have already pointed out, it does hypothesize facts which were substantially conceded, but it conjunctively required the additional finding of the essential issue re-

lating to whether the operation in question was a part of defendant's usual business. The instruction is short and contains a clear and simple submission of the issue to which it related. When the jury considered it in conjunction with Instruction No. 4 (as it was required to do) which submitted the same issue in words chosen by defendant it could not have been confused or misled thereby. We accordingly rule that Instruction No. 5 was not prejudicially erroneous.

■ The next contention of defendant is that the court erred in excluding certain testimony. Arthur Matten testified that he was personnel manager of U. S. Steel Supply with offices in Chicago. He stated that the company had 19 warehouses in the United States for the processing and sale of steel and aluminum products. Defendant's counsel then asked this question: "Can you tell me whether or not any of these branches of U. S. Steel Supply, Division of United States Steel Corporation, have drivers of their own?" Plaintiff's objection was sustained and defendant then offered to prove that "if the witness were permitted to testify he would testify that several branches of the United States Steel Supply Company, Division of United States Steel Corporation, the defendant in this case, that they have and do employ employees who drive and deliver their merchandise from the warehouse to the customers, and in some instances they do own equipment for delivery purposes." Plaintiff's objection that the proffered evidence was immaterial and too remote was sustained. In support of its contention that the ruling constituted prejudicial error defendant states in its brief that the proffered testimony "was relevant and material on the issue of whether the delivery of its products at its St. Louis warehouse was an operation of the usual business carried on. It would tend to prove whether it is an operation that could be, and was, habitually and customarily carried on by said defendant. Whether delivery was ordinarily and customarily a part of the plan of operation carried on by said defendant; whether delivery could properly be carried

out by direct employees and whether it was an important part of the business." No case is cited in which the admissibility of evidence of this nature has been considered.

In considering this point we note that defendant did not offer to prove that it was a custom and practice of defendant in its other plants to make delivery by its own trucks and employees. Neither did it offer to prove that it was a general custom in the industry as a whole to make deliveries in that manner. Nor was there an offer to prove that the operations and delivery conditions at the plants where defendant made its own deliveries were the same or similar to conditions at the St. Louis plant. Defendant merely offered to prove that at *several* branches its own employees drove equipment in delivering merchandise to customers and in *some* instances it owned equipment used for delivery purposes.

In Webster's Third New International Dictionary, "several" is defined as "more than one," and "some" as "being one, a part, or an unspecified number of something." In substance, the proffer was merely an offer to prove that at more than one of its plants defendant made deliveries by its own employees or equipment. We have concluded that the court did not err in excluding the proffered testimony. The general rule is that evidence of transactions not connected with those involved in the particular case on trial are not admissible. Rice v. Lammers, Mo.App., 65 S.W.2d 151. The most that the proffered testimony would have tended to show was that defendant might or perhaps could have made deliveries at St. Louis by its own employees and equipment if it had seen fit to do so. In another "statutory employee" case it is stated that "if all activities that one might engage in renders him liable as for operating a business, he would be liable in probably all cases where the work was being done by an independent contractor. * * * [T]he operation must not only be of the usual business which the employer carries on at his premises where the accident occurs, but

the employee must be injured in the usual course of his employer's business." Pitts v. Maupin, 230 Mo.App. 221, 88 S.W.2d 384, 386. It has also been said generally that "Evidence of this type relating to similar acts or occurrences should always be received, when it is received, with considerable caution for it injects into the trial a collateral issue that may at times confuse and mislead the jury. But, if the conditions and circumstances are substantially the same, such evidence may, in the discretion of the trial court, be admitted. Lake Superior Loader Co. v. Huttig Lead & Zinc Co., 305 Mo. 130, 264 S.W. 396." Lindsey v. Rogers, Mo.App., 220 S.W.2d 937, 940, 941. We are of the view that the proffered evidence was not admissible but, in any event, it was a matter within the discretion of the trial court and that discretion was not abused in this instance.

The next contention of defendants is that the court erred in overruling their motion for new trial because the verdict was the result of passion and prejudice against defendants which was induced by a number of trial incidents hereinafter described. The first two incidents related to the failure of plaintiff and his wife to control their emotions. In describing these we quote portions of defendants' brief. During the testimony of Dr. Burford plaintiff and his wife were seated among the spectators in the courtroom. After the witness had described a painful treatment procedure to which plaintiff must submit at intervals during the remainder of his life "plaintiff stood up in the courtroom and let out a cry and remained standing for a few seconds crying and went out of the courtroom door. His wife followed him and she, likewise, was crying. Plaintiff and his wife came back into the courtroom in about 10 minutes, both crying, and took seats in the courtroom. Part of this was heard by the court. Number 1 and 2 jurors talked at length, and juror No. 1 nodded towards plaintiff and his wife. The defendant moved for a mistrial, which was denied by the court. Again at a later time plaintiff was sitting in the back of the courtroom mopping his eyes with his handkerchief and rolling his head down. Defendant again moved for a mistrial which was denied by the court." The first incident was not noticed by counsel on either side. Complaint was made about five minutes later when another attorney in the courtroom called the matter to the attention of defendants' counsel.

■■ An effort should always be made to avoid demonstrations of the nature herein described but it is well established that their prejudicial effect is a matter to be determined by the trial court in the exercise of its sound discretion. Clark v. McKeone, Mo.Sup., 234 S.W.2d 574; Boese v. Love, Mo.Sup., 300 S.W.2d 453; Brooks v. Mock, Mo.Sup., 330 S.W.2d 759.

■ During the cross-examination of defendant's plant manager plaintiff's counsel asked the following question: "Q. What is a ton of steel selling for these days?" An objection was promptly sustained. Defendants' complaint concerning this question is without merit. While the question was irrelevant it was not answered and was not the type of question that could possibly have been prejudicial to defendant.

Complaint is also made in regard to three portions of the argument of plaintiff's counsel as follows: "(1) This is not damages. This is a debt which is owed to Mr. Walton and which they must pay to him. There is no difference than if the United States Steel sent a shipment of goods somewhere and it was damaged. United States Steel would demand, I'm sure, if the value of their cargo was worth a half a million or three-quarters of a million dollars, they would demand full measure—Mr. Robertson: I object to this type of argument. It is not within the confines of the evidence. The Court: Sustained. Mr. Robertson: I ask the court to instruct the jury to disregard it. The Court: The court instructs the jury they are to disregard the statement made by plaintiff's counsel. * * * (2) The shock and mental anguish, physical

pain of body, future pain and suffering of the body, if you give him a thousand dollars a year—Mr. Robertson: I object to that. It's improper argument—The Court: Sustained. Mr. Robertson: I want to make a record. It's improper argument. It is made with one intent and purpose in mind, to bias and prejudice the jury, and I ask at this time for a mistrial for that reason. The Court: The objection will be sustained. The motion will be denied. Mr. Hulverson: Forty years is what this man's life expectancy is. Dr. Burford and other doctors, not my doctors, nor Ed's doctors, doctors he didn't know before. They don't select the ones he wanted. These are doctors they called upon. Forty years is his life expectancy. Would forty thousand dollars into forty years be asking too much? Mr. Robertson: I make the same objection for the same reason. It's improper. The Court: Sustained. * * * (3) I told you what I think his injuries are worth. I know that some people put a definite value, heaven alone can put a value on it. I don't know what executives or secretaries of corporations are making, five, or six or seven hundred thousand dollars a year. If they're worth it or not, I don't know. Mr. Robertson: I object to that as improper argument, and I ask for a discharge of the jury. This is the second time he has referred to this matter, and it is done to prejudice and inflame the minds of the jury. The Court: The objection will be sustained. The motion denied." It will be noted that in each instance the court sustained defendants' objection to the quoted argument.

We agree with the cases cited by defendant which state the rule that if the verdict is the result of passion and prejudice on the part of the jury the error cannot be cured by a remittitur but a new trial should be ordered. Clark v. Atchison & Eastern Bridge Co., 333 Mo. 721, 62 S.W. 2d 1079; Olian v. Olian, 332 Mo. 689, 59 S.W.2d 673. However, the matter of determining whether the argument complained of and the occurrences relating to emotional display, as heretofore described, engendered passion and prejudice on the part of the jury is something which we think should be left largely to the discretion of the trial court. The court heard and observed all of these matters and was aware of the circumstances surrounding each one and the general atmosphere of the trial. We see nothing in this record to indicate that the trial court abused its discretion in failing to grant defendants a new trial because of the incidents heretofore described, whether such are considered separately or cumulatively. This point is accordingly ruled adversely to defendants.

The final contention of defendants is that the verdict was grossly excessive and even after remittitur is still excessive. We will briefly summarize the evidence adduced on the question of damages. This evidence will be stated in the light most favorable to plaintiff. Shortly after plaintiff was injured he was taken by ambulance to the Missouri Baptist Hospital in St. Louis where it was found that he had suffered multiple comminuted fractures of the pelvis and soft tissue injuries in that area which included a complete severance of the urethra and damage to the prostatic gland and related structures. A metal catheter was inserted in the urethra and remained therein for 12 days. It was then removed and replaced by a rubber catheter which was left in the urethra until June 25. Plaintiff remained in the hospital from June 3 until June 29 and was then removed to his home by ambulance. He was returned to the hospital on July 8 and discharged July 16. Thereafter plaintiff remained in bed at home for about eight weeks. After being permitted to leave his bed he used crutches for five or six weeks and then used a cane until the latter part of November 1960. The fractures of the pelvis healed in good position with the exception of the fracture which extended into the left hip socket. There is an offset in the surface of this socket which has caused a roughness on the surface which causes pain, and in the opinion of Dr. Bohne, plaintiff will develop traumatic arthritis in this hip.

Plaintiff also sustained an injury to the sciatic nerve which resulted either from a ruptured intervertebral disc or a direct injury to the nerve resulting from the soft tissue injuries inside the pelvis. This has caused frequent intermittent pain down the back of plaintiff's left leg extending to the toes. There is some loss of sensation on the left side of the left thigh and an absence of any reflex of the Achilles tendon of that leg. Plaintiff testified that this leg on several occasions had "given way" and also, on occasions, he had suffered from a big knot or "charley horse" in this leg, accompanied by severe pain. Plaintiff walks with a slight limp. The medical testimony was to the effect that the condition of plaintiff's left leg is permanent.

Plaintiff's urethra united in three or four weeks, but it soon became apparent that scar tissue resulting from the healing process had caused the urethra to close so that plaintiff could not pass his urine. In order to remedy this condition if was necessary for the doctor to insert an instrument called a French sound into the urethra which would dilate the area where the stricture closed the urethra. This procedure is very painful and for about two days after each dilation plaintiff suffers pain in voiding his urine. The medical testimony indicates that it will be necessary for plaintiff to submit to this procedure of dilation every three weeks for the rest of his life. The reasonable cost of each dilation is $10 which, during the period of plaintiff's life expectancy, will require a total expenditure of about $6,500. There is also some danger of infection each time dilation is accomplished and there is always some bleeding on those occasions.

Plaintiff testified that prior to his injury he had had normal sexual relations with his wife but that since the injury he had been unable to have intercourse because of his inability to obtain an erection; that he had a constant desire to have intercourse but was unable to accomplish same and this caused him to be depressed and nervous.

Dr. Lam, a neurologist, testified that the injuries plaintiff sustained furnished a medical foundation for his complaint of impotency and that in his opinion that condition is permanent. Dr. Burford also expressed the opinion that plaintiff was impotent and that his condition in that respect is permanent. There was also evidence that since plaintiff's injuries he had experienced considerable difficulty in sleeping and had been using rather powerful sleeping capsules for a considerable period of time.

At the time of injury plaintiff was 28 years of age and, at trial time, had a life expectancy of 38.61 years. He had an eighth grade education and had been a truck driver for a number of years. For a period of two or three years prior to the casualty he had had gross earnings of about $6,000 a year and, after income tax deductions, a net income of approximately $5,000 per year. Prior to being injured he had enjoyed good health with the exception that he had been treated for about six months in 1957 for an ulcer. During the 10½ months which elapsed between the time of injury and the date of trial plaintiff had lost about $4,500 in wages. His hospital and medical expenses had totaled about $1,600 and, as stated, the cost of future dilations will total about $6,500. Without stating the details, it may be said that for a period of several months following his injuries plaintiff suffered a great deal of pain and that he will permanently suffer future pain to some extent in his left hip and leg, and will suffer considerable pain each time it is necessary to repeat the process of dilating his urethra. The prospect of being required to have a dilation at intervals the rest of his life, and his inability to have intercourse, have also caused nervousness and sleeplessness on his part. Plaintiff is not totally disabled from performing work but, according to his testimony and the medical evidence, he will never be able to return to his former employment as a truck driver or to do other heavy manual labor. He is able, however,

if employment can be obtained, to do work not requiring heavy manual labor, lifting, bending, or constant standing. One physician expressed the opinion that plaintiff's future employment should be limited to a "sitting chair occupation."

"There is no precise formula for gauging whether a verdict is excessive. Each case depends upon its own peculiar facts. Consideration must be given the nature and extent of the injuries and losses, plaintiff's age and his diminished earning capacity, if any, the changing economic factors and the amount of compensation awarded and approved in cases similar or of fairly comparable injuries. The ultimate test of excessiveness or of inadequacy of an award is what will fairly and reasonably compensate for the injuries sustained." Parlow v. Carson-Union-May-Stern Co., Mo.Sup., 310 S.W.2d 877, 885.

■ In this case we are impressed with the fact that plaintiff has suffered considerable pain in the past, and, in the future, will suffer pain each day in his left hip and leg, and will be required to endure the painful dilation procedure every three weeks during the remainder of his life. Also, we must give consideration to the fact that plaintiff is permanently impotent and has lost the power to procreate. We have found no case which makes any suggestion as to an appropriate manner of evaluating that type of disability. However, it is a very real element for consideration and should not be lightly cast aside. Plaintiff testified that he has an almost constant desire for intercourse but is unable to accomplish that act. This inability to satisfy that desire, and the nervousness resulting therefrom, should be classified in the general category of physical and mental suffering which, of course, is a proper element to be taken into account in fixing the amount of damages.

There is no contention that plaintiff is totally disabled. However, he cannot go back to his former occupation nor do any type of heavy manual labor. With his limited education it is likely that he will have difficulty in obtaining employment involving only light work or "sitting chair" duties. While there is no evidence as to the amount plaintiff will be able to earn in the future, it is clear that his earning power has been greatly impaired.

■ Although we recognize that no two cases are exactly alike, we should obtain some assistance in determining this question from comparable cases previously decided. Plaintiff has cited the case of Moore v. Ready Mixed Concrete Co., Mo.Sup., 329 S.W.2d 14, in which we, in 1959, affirmed a personal injury judgment for $150,000, and the case of Myers v. Karchmer, Mo. Sup., 313 S.W.2d 697, decided in 1958, in which a $100,000 judgment was affirmed. The Moore case is somewhat applicable although plaintiff in that case was considered totally disabled and the special damages were much greater than in the case at bar. The Myers case is so different upon the injuries, as well as the special damages involved, that we do not find it helpful. In the cited case of Sullivan v. City & County of San Francisco, 95 Cal.App.2d 745, 214 P.2d 82, a judgment of $125,000 was held not to be excessive. The plaintiff's injuries in that case were very similar (slightly more severe) to those of instant plaintiff, although in Sullivan it was necessary to have plaintiff's permanent scar tissue stricture dilated every ten days. He was seven years younger than Walton but earned less than one half as much. While Sullivan was rendered impotent by the casualty, that condition did not cause him any suffering (unlike plaintiff) as he has since had no desire for sexual intercourse. While that case was decided by an appellate court of another state, we nevertheless consider that it lends strong support to plaintiff's contention that the judgment herein is not excessive.

In support of their claim of excessiveness defendants have cited our recent cases of Breland v. Gulf, Mobile & Ohio R. Co.,

Mo.Sup., 325 S.W.2d 9, in which a $75,000 judgment was held excessive by $25,000, Van Norman v. Illinois Central R. Co., Mo. Sup., 320 S.W.2d 512, which held that a $62,400 judgment was excessive to the extent of $15,000, Giambelluca v. Missouri Pac. R. Co., Mo.Sup., 320 S.W.2d 457, wherein a $25,000 remittitur was required from a $75,000 judgment, and Caraway v. Atchison, Topeka & Santa Fe Ry. Co., Mo. Sup., 318 S.W.2d 331, in which the $60,000 judgment was ordered reduced to $45,000. These cases are all distinguishable upon the facts involved. While all of those plaintiffs had sustained serious injuries, none had suffered impotency nor were faced with frequent painful procedures such as plaintiff's periodic dilations. In none of those cases did the plaintiff earn nearly as much as Walton earned prior to the injury, and in Caraway and Giambelluca the plaintiff had already returned to work at substantial wages at trial time. We also note that in Breland and Giambelluca the plaintiffs were considerably older than the present plaintiff. While the cases herein discussed may not be said to be wholly inapplicable in our determination of the question before us, we have concluded that they are not decisive thereof.

Before ordering the remittitur in the amount of $46,000 the trial court obviously gave careful consideration to the question of damages and weighed the evidence in that regard. That court had seen and heard the witnesses and had the opportunity of observing the plaintiff throughout the trial which lasted more than a week. For that reason the trial court was in a better position than we are to evaluate the testimony and to determine the effect of the injuries upon plaintiff. The remittitur ordered was in a substantial amount and constituted approximately one third of the verdict. In cases where the trial court has considered the question of excessiveness and, as here, has ordered a substantial remittitur, we are usually reluctant to order a further reduction. Parlow v. Carson-Union-May-Stern Co., supra.

Because of certain unusual elements of damage in this case, we have found it somewhat difficult to determine the maximum amount for which a judgment should be permitted to stand and, in that situation, we are not in a position to confidently say that the trial court abused its discretion in failing to order a remittitur in a larger amount than the one it ordered. We accordingly rule that the judgment appealed from is not excessive and that no further remittitur should be required.

The judgment is affirmed.

COIL and HOUSER, CC., concur.

PER CURIAM.

The foregoing opinion by HOLMAN, C., is adopted as the opinion of the court.

All concur.