Dear Representative Sweeney:
This opinion is issued in response to your request for a ruling on the following question:
 Does Missouri law permit the St. Louis School District to use federal funds to provide services to nonpublic school students on either public school or neutral sites at times other than during the regular school day?
The following facts pertain to your request:
For the past three years, the St. Louis School District has received federal funds under the provisions of the Emergency School Aid Act (ESAA), 20 U.S.C. § 1601, et seq., for the purpose of reducing minority group isolation in the schools. Such funds have been utilized for the support of the district's Magnet School Program. The Magnet School Program involves the establishment of a number of specialized elementary and secondary schools in the district, each having a particular area of emphasis (i.e. Math/Science, Performing Arts, Basic Education, etc.) and each having an integrated student population. The district has applied for an ESAA grant for the 1979-80 school year and that application is pending.
ESAA requires a local education agency that receives funds to provide for the participation of nonpublic school students and staff on an "equitable basis." 20 U.S.C. § 1609(a)(12). In meeting this requirement, the St. Louis School District had provided public school teachers on the premises of sectarian schools.
In response to a question concerning the constitutionality of this practice, this office issued a ruling in Opinion No. 181 (1979), which concluded:
 "`(1) Federal funds paid directly to the Board of Education of the City of St. Louis under the provisions of the Emergency School Aid Act (ESAA) constitute public funds which are subject to the spending proscriptions of the Missouri Constitution.
 "(2) The Missouri Constitution prohibits the use of public school personnel paid with ESAA funds to provide teaching services to children attending sectarian schools on the premises of the sectarian schools during the regular school day.'"
Following that opinion, the district removed public school personnel from the sectarian schools and on January 18, 1979, forwarded a copy of the opinion to the Department of Health, Education, and Welfare (HEW) and requested HEW to issue a waiver of the nonpublic participation requirement. (A waiver is authorized where the local education agency is prohibited by law from providing for the equitable participation of nonpublic school children and staff. If a waiver is instituted by HEW, that agency is obligated to make other arrangements for such nonpublic participation. 20 U.S.C. § 1611 (d)(1). These arrangements are commonly known as a "bypass.")
HEW has taken the position that activities and services other than the provision of teaching personnel on the premises of parochial schools during the regular school day may meet the "equitable participation" requirement of ESAA. HEW has expressed its reluctance to implement a bypass unless or until it is shown that these other activities or services are also prohibited by law, or unless these programs are shown in practice not to be equitable. The following are examples of services which could be provided:
 (1) Remedial, guidance, counseling, and other auxiliary services either after school, on weekends, or during the summer months. Such services would be provided either on public school premises or on neutral sites and would be conducted by personnel employed by the district;
 (2) The purchase and loan to nonpublic pupils of instructional materials and equipment of a type incapable of diversion to religious use. Such materials and equipment would be used and stored only in connection with the activities described above and only on public school or neutral sites;
 (3) Bus transportation to nonpublic students to and from the public school or neutral site where the program described above takes place.
You have indicated that the district would be willing to provide any services to nonpublic school children which would meet the equitable participation requirement so long as those services are consistent with Missouri law.
At the outset, we note that we are not being asked, nor do we express any opinion as to whether or not any particular program or combination of services does in fact meet the equitable participation requirement of ESAA. This opinion will be addressed solely to the propriety of providing those services under the Missouri Constitution.
The feature characterizing this inquiry which distinguishes it from most precedents of the Missouri Supreme Court is that the educational services are not to be offered on the premises of parochial schools nor during the regular day. Thus, cases such asPaster v. Tussey, 512 S.W.2d 97 (Mo.Banc 1974), which prohibited the lending of textbooks to pupils for use in classes in parochial schools, is not applicable. In that case, the court discussed the "pupil-parent benefit theory," i.e., that the provision of textbooks to pupils in parochial schools could be considered solely as a service to pupils, and not one which would be "in aid of any . . . sectarian purpose," as proscribed by Article IX, § 8 of the Missouri Constitution. The court rejected that theory, stating,512 S.W.2d at 104-105:
 ". . . However, for the purposes of this case we have applied the `pupil-parent benefit' theory, without deciding if we were at liberty to do so in light of the absolute separation of church and state doctrine evidenced throughout the Missouri Constitution, to the statute and Art. IX, § 8. Is the expenditure of funds to the pupil-parent in aid of a sectarian purpose? Which, in turn, calls for deciding whether or not an individual can have a sectarian purpose, or whether or not only a `sect' can have such a purpose. When a sect, be it religious, political or otherwise, establishes a school for promoting and perpetrating the tenets of the sect a sectarian purpose is evident. If such a purpose did not exist, it would be totally illogical for the sect to assume the financial burden of providing a school for its followers. In the instant case, most of the schools, denominated as private, have the worthy objective of providing pupils with an education at a place permeated with a religious atmosphere. To succeed, or even exist, such a school must have pupils (or parents thereof) who are adherents of the same sectarian purpose. Individuals, acting individually or collectively, can have and promote a sectarian purpose, and by attending a private school designed for such a purpose do, in fact, promote the sectarian objective for which Art. IX, § 8, prohibits the expenditure of any public funds."
In Special District for Education and Training of HandicappedChildren of St. Louis County v. Wheeler, 408 S.W.2d 60 (Mo.Banc 1966), the court examined a practice by which parochial school pupils were released during part of their school day to receive speech therapy in buildings maintained by the public school district. The court expressly invalidated the practice of providing publicly paid speech therapists to the pupils on parochial school premises as a violation of Article IX, § 5 of the Missouri Constitution, but its rejection of the "release-time" practice was based not on the Constitution, but rather on an interpretation of the state's compulsory attendance laws, concluding that those statutes require the child to attend one school, public or private, for the minimum six hour school day. The court expressly declined to address the validity of a program which provided the speech therapy services to pupils enrolled in parochial schools where the services were offered on public school sites outside the regular school day.
That is the question we must address here. The Wheeler
case, supra, by invalidating the "release-time" practice on compulsory attendance grounds rather than constitutional grounds leads us to believe that the elimination of the compulsory attendance factor (by providing services outside the regular school day) is sufficient to validate the provision of the ESAA services described above.
We do not believe that the characterization of a child as a "public school pupil" or a "parochial school pupil" retains significance during hours which do not constitute the statutorily defined school day. Although the court indicated in Paster v. Tussey
that aiding a pupil attending a parochial school does promote a sectarian purpose, there is no basis for concluding that such children promote that purpose by virtue of their participation in any other activities (educational or otherwise) beyond their school attendance. A child is neither a public school child nor a private school child outside the regular school day and away from the premises of a sectarian school. To conclude otherwise would mean, for example, that a public library could not show an educational film in the evenings which would be viewed by pupils enrolled in parochial schools because the expenditure of public funds for such an activity would aid a sectarian purpose by aiding the child. We therefore conclude that when a public school district offers programs or services on premises owned or maintained by them, and such programs are open to any child (public or private) who is eligible and who desires to participate, there is no aid to a sectarian purpose, Article I, § 7, and Article IX, § 8 of the Missouri Constitution, and the expenditure of funds for those services is a public school purpose, Article X, § 1, and Article IX, §§ 1(a) and5 of the Missouri Constitution.
We believe, however, that the transportation of pupils from parochial schools to the public sites where the programs take place has been disapproved by the court. In Mallory v. Barrera,544 S.W.2d 556, 562 (Mo.Banc 1976), the court discussed briefly some practices under Title I, stating:
 "[6] As to defendants' counterclaim, there is evidence (1) that `Title I funds are used [by the state] to provide certain textbooks and library books and reading materials sent in to the nonpublic schools * *' and (2) that Title I funds have been approved by the state for use `to transport the nonpublic school child from the nonpublic school to the public school for * * * after school services or Saturday services * * *.' Clearly, the use by the state of public funds to provide textbooks (Paster v. Tussey, 512 S.W.2d 97, 104 (Mo. banc 1974)) for use in parochial schools, or to provide transportation (Mo. Const. Art. IX, § 8; McVey v. Hawkins, 364 Mo. 44, 258 S.W.2d 927 (Mo.banc 1953)) for parochial school students, is impermissible under the constitution of this state."
Although we are not dealing here with textbooks or materials "sent in" to the nonpublic schools, we are faced with the court's explicit ruling that public funds may not be used to transport children from the nonpublic school to the public school for after school and Saturday programs. This does not prohibit transporting children from their homes or from sites other than non public schools to ESAA programs at public or neutral sites.
CONCLUSION
Based on the foregoing, we conclude that remedial, guidance, counseling, and other auxiliary services may be provided to any child after the regular school day, on weekends, or during the summer on public school premises or neutral sites, conducted by school district employees, regardless of whether the child regularly attends a public or parochial school. Secular instructional materials and/or equipment used in connection with the program may be provided to participating pupils. Bus transportation designed solely for the purpose of transporting pupils from their nonpublic schools to the public school site may not be provided.
The foregoing opinion, which I hereby approve, was prepared by my assistant, Sheila K. Hyatt.
Very truly yours,
 JOHN ASHCROFT Attorney General